STATE of Tennessee, Appellee,

v.

**Shearon DAVIS and Guess What, Inc., Appellants.**

Court of Criminal Appeals of Tennessee, at Jackson.

March 17, 1983.

Permission to Appeal Denied by Supreme Court June 20, 1983.

Tommy H. Jagendorf, N. Alan Lubin, Michael F. Pleasants, Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Memphis, for appellants.

William M. Leech, Jr., Atty. Gen., Jennifer Helton Small, Asst. Atty. Gen., Hugh W. Stanton, Jr., Dist. Atty. Gen., W. Fred Axley, Asst. Dist. Atty. Gen., Memphis, for appellee.

## OPINION

SCOTT, Judge.

The appellants and two co-defendants were charged in a twenty-four count indictment with the unlawful distribution of obscene material. Six counts related to each of the four defendants, Shearon Davis, Jerry Bergen, Gene Brewer and Guess What, Inc. The subjects of the indictments were three motion picture films and three magazines which were purchased by undercover law enforcement officers. Each count related to a separate film or magazine. At their joint trial Ms. Davis was found guilty of all counts related to her. She received a sentence of sixty days in the county jail on each count, which the trial judge ordered served concurrently. Mr. Brewer was also found guilty on each count in which he was charged and also received a sentence of sixty days on each count. The trial judge granted Mr. Brewer's motion for judgment of acquittal and, of course, his case is not before this Court. The corporate defendant was found guilty and a fine of $50,000.00 was assessed as to each count, for a total of $300,000.00. Mr. Bergen was not tried with the other defendants and the disposition of his case does not appear in the record.

The appellants have presented five issues for our consideration. In the first issue the appellants question whether the Tennessee obscenity statutes (TCA § 39–6–1101, et seq. (formerly TCA § 39–3001, et seq.)), are constitutional under Article 1, Section 19 of the Tennessee Constitution, which provides in pertinent part:

> That the printing presses shall be free to every person to examine the proceedings of the Legislature; or of any branch or officer of the government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions, is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty.

However, the appellants candidly admit that in *Taylor v. State ex. rel. Kirkpatrick,* 529 S.W.2d 692, 699 (Tenn.1975), our Supreme Court held these statutes to be constitutional. Our Supreme Court having addressed this issue, its determination is conclusive and is binding on this Court and all other inferior courts of this state. *Barger v. Brock,* 535 S.W.2d 337, 340 (Tenn. 1976). This issue has no merit.

In the next issue the appellants question whether the obscenity statute is unconstitutional because it exempts certain individuals and organizations from its coverage. According to the appellants, this exemption violates the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

TCA § 39–6–1117 (formerly TCA § 39–3016) exempts from the provisions of the obscenity statute the following:

(1) Any public library which is entirely or partially supported by public funds;

(2) Any recognized and established educational institutions and the libraries therein;

(3) Any recognized and established museum;

(4) Any recognized and established historical society;

(5) Any licensed practitioner of the healing arts, medical clinic or hospital while engaged in a professional capacity;

(6) Any governmental agency;

(7) Any governmental sponsored organization;

(8) Any other nonprofit association or entity which is engaged in the collection and preservation of historic or religious documents; and

(9) Any person, employee or agent acting in an official capacity for such organization.

The appellants contend that this section is arbitrary and creates a constitutionally impermissible classification. In support of their position the appellants rely on *Leech v. American Booksellers Association, Inc.*, 582 S.W.2d 738, 755 (Tenn.1979).

In *Leech,* our Supreme Court found that a prior obscenity act was unconstitutional because it included taxable entities and excluded nontaxable entities from its coverage. Our Supreme Court noted that:

(I)f "nontaxable entity" could be construed to exempt those religious, charitable, scientific or educational general welfare corporations that pay no taxes and

include those who pay any taxes, however small, the classification would have no rational basis in the context of the criminal offense involved herein and would be void under the Equal Protection Clause of the federal and state constitutions.

As the appellants noted, in *Leech* our Supreme Court cited with approval, *Wheeler v. Maryland,* 281 Md. 593, 380 A.2d 1052 (1977), in which the Maryland Supreme Court declared that state's obscenity law unconstitutional because a bookstore employee was covered by the Act, but employees of motion picture theaters were exempted. The Maryland Court found no rational relationship to a legitimate governmental interest in subjecting the employees of sellers of obscenity to prosecution, but exempting the employees of exhibitors. 582 S.W.2d at 755.

In *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961), the Supreme Court reaffirmed the established view that under the Fourteenth Amendment of the United States Constitution the states are endowed with a wide scope of discretion in the enactment of laws which affect certain groups of citizens differently than others. However, such classifications must be based on grounds reasonably related to the achievement of a legitimate state objective. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. See also: *Motlow v. State,* 125 Tenn. 547, 145 S.W. 177, 180 (1912); *State v. Nashville, Chatt. & St. L. Ry. Co.,* 124 Tenn. 1, 135 S.W. 773, 775 (1911).

In *City of Duluth v. Sarette,* 283 N.W.2d 533, 536 (Minn.1979), the Minnesota Supreme Court considered an exemption provision similar to the Tennessee provision which was part of the obscenity section of the Duluth City Code. The Court there stated:

(T)he city asserts that the exemption serves the important function of permitting the exempted organizations to disseminate or utilize obscene material for legitimate educational, scientific, or artis-

tic purposes without fear of criminal prosecution. We believe that such an objective is justified and rationally related to a legitimate governmental purpose. It is essential that governmental units, by prohibiting the sale or dissemination of obscene materials, do not at the same time stifle scientific, medical, educational, or other bona fide uses.

■ The exemption in our statute also serves the important purpose of allowing materials which might be classified as obscene to be used for legitimate educational, scientific or artistic purposes without fear of prosecution. The goal of ridding society of obscene materials totally lacking any serious literary, artistic, political or scientific value is a legitimate one. The classification is not arbitrary. Therefore, the exemption is valid.

The appellants also argue that since the exemption does not place any limitations on the uses to which allegedly obscene materials may be put by the exempt organizations, the statute is overbroad and fails to relate to the exemption's ultimate purpose. In support of this proposition the appellants rely on *Leech v. American Booksellers Association, Inc.,* supra, and *City of Duluth v. Sarette,* supra. In both of these cases the courts struck down exemption provisions wherein those exempt were classified on the basis of their status as taxpayers, i.e., whether they were taxable or nontaxable entities. In *Leech,* our Supreme Court held that such a classification is "too nebulous, too lacking in definite limits and too vague to inform men of common intelligence who is included and who is exempt from the criminal penalties of the Tennessee Obscenity Act". 582 S.W.2d at 755. In *Sarette,* the Court condemned the classification based on the taxable status of the entity as lacking a rational basis, since "there are undoubtedly organizations which could conceivably obtain tax-exempt status and muster support from the public, but whose objective in distributing such material would have no purpose other than to appeal to the prurient interest". 283 N.W.2d at 536.

Although the term, "any recognized and established", as applied to various institutions, is not absolutely precise, "lack of precision is not itself offensive to the requirements of due process". *Roth v. United States,* 354 U.S. 476, 491, 77 S.Ct. 1304, 1312, 1 L.Ed.2d 1498 (1957). As our Supreme Court noted in *State v. Strickland,* 532 S.W.2d 912, 921 (Tenn.1975):

> The basic concept behind the vagueness doctrine is the idea of fairness, and that the statute should be sufficiently specific to provide notice of the type of conduct expected. The doctrine should not be used to create a constitutional dilemma out of the practical difficulties in drawing statutes.

■ So long as these appellants were given adequate warning as to what conduct was proscribed, they cannot complain of a due process violation. See *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972), *Roth v. United States,* supra, *Taylor v. State ex rel. Kirkpatrick,* supra. One "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others". *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982).

· The exemptions set forth in TCA § 39–6–1117 are constitutional, and this issue has no merit.

The appellants' next constitutional issue is that the punishment for Class A and Class B violators set forth in TCA § 39–6–1104(e)(1) and (2), (formerly TCA § 39–3004(e)(1) and (2)) is an unconstitutional classification in violation of the Equal Protection Clause and is also vague and indefinite under the Due Process Clause.

> TCA § 39–6–1104(e)(1) and (2) provide:
> (e)(1) For purposes of this subsection, a Class A violator shall be any person sentenced under the provisions of subsection (d) who distributes obscene books, magazines, newspapers, pictures, drawings, photographs or other printed or written material when such obscene material represents twenty-five per-

cent (25%) or less of the stock-in-trade, and inventory, and sales of such violator during any given twenty-four (24) hour period. A Class B violator shall be any other person sentenced under the provisions of subsection (d) who is not defined as a Class A violator. Upon application for sentencing as a Class A violator, as defined above, such violator shall have the burden of proving his classification.

(2) The sentences imposed in subsection (d) of this section shall be mandatory for a Class B violator, and no Class B violator sentenced under the provisions of such subsection shall be eligible for suspension of sentence and probation, release on parole, or any other program whereby such person enjoys the privilege of supervised or unsupervised release into the community or whereby such person is released, permanently or temporarily, prior to the expiration of his sentence, including, but not limited to, participation in any programs authorized by §§ 41–21–208 or 41–21–227. Provided, further, no Class B violator sentenced under subsection (d) of this section shall receive good, honor or incentive time credit towards the expiration of such sentence as authorized by §§ 41–21–212, 41–21–214 or 41–21–228; nor shall such sentence expire in any other manner until it has been entirely served day for day.

The appellants argue that the classifications set forth in this statute bear no rational relationship to any legitimate governmental interest and are thus purely arbitrary.

Our Supreme Court has upheld the power of the General Assembly to distinguish among the degrees of wrongdoing under a particular statute and to punish violators according to the extent to which their conduct deviates from the social norm. In *State v. Hinsley,* 627 S.W.2d 351, 355 (Tenn. 1982), our Supreme Court upheld the constitutionality of our habitual drug offender statute which punished more severely drug dealers "whose conduct causes a more seri-

ous threat to our society" than the conduct of only users. Such a classification was held to bear a rational relationship to the legitimate governmental interest in the deterrence of the traffic in illicit drugs.

In this case the legislature has chosen to single out those offenders who deal more heavily in obscene materials and subject them to more severe punishment. Under the statute, the break point between Class A and Class B violators is 25% of the stock-in-trade, inventory and sales of the violator during any given twenty-four hour period. While this is an arbitrary figure, any figure that the legislature might have chosen would be equally arbitrary. However, it is legitimate to draw the line somewhere, and the General Assembly has seen fit to do so at 25%.

The appellants also allege that this section unconstitutionally distinguishes between those who sell obscene printed matter and those who sell obscene movies. This section must be read in *pari materia* with TCA § 39–6–1101(4) (formerly TCA § 39–3001), which defines obscene "matter" to include motion picture films. In addition, "movies" are motion "pictures". *Webster's New World Dictionary of the American Language,* 2d College Edition (1980), p. 932. Among the forbidden items listed in TCA § 39–6–1104(e)(1) are obscene "pictures".

It is also contended that the language of this section is too vague to inform men of common intelligence as to who is included in Class A and who is included in Class B. However, the parameters of the classes are clearly set forth by the legislature and are sufficiently well defined for the courts to fairly administer the law. No more is required. *Taylor v. State ex rel. Kirkpatrick,* supra, at 696.

The appellants also challenge the portion of the statute that subjects corporate defendants to a fine. TCA § 39–6–1104(f) (formerly TCA § 39–3004(f)) provides:

(f) Any corporation or entity doing business in the state of Tennessee which violates the provisions of this section shall, upon conviction, be fined an

amount of not less than ten thousand dollars ($10,000) nor more than fifty thousand dollars ($50,000).

The appellants complain that because the term "entity" is not defined, the statute is unconstitutionally vague. However, the proof clearly revealed that Guess What, Inc., is a corporation and the statute specifically addresses "any corporation". The corporate appellant has no standing to complain of any shortcomings of this Code section as it might be applied to some other business entity. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* supra, at 102 S.Ct. at 1191. It is not a proper function of appellate courts to envision in advance of application all possible contingencies of attempted prosecution under a criminal statute and declare which are constitutional and which are not. *State v. King,* 635 S.W.2d 113, 114 (Tenn.1982), citing *Watson v. Buck,* 313 U.S. 387, 402, 61 S.Ct. 962, 967, 85 L.Ed. 1416 (1941). TCA § 39–6–1104(e)(1), (2) and (f) are constitutional in every respect, and this issue and the sub-issues have no merit.

In the next issue the appellants question whether the films and magazines are obscene.

The state contends that the appellants have waived this issue by failure to comply with Rule 27(a)(7), T.R.A.P., because the brief contains no citations to any authorities. However, the appellants' brief sets forth their argument and, as the state concedes, correctly sets forth the requirement that this Court is required to conduct an independent review of the materials. *Taylor v. State ex. rel. Kirkpatrick,* supra, at 699. Because of the nature of this issue, there are no authorities to be cited. There are no legal materials to which the court can look to determine whether *these films* and *these magazines* are obscene. Rather, what is required is for this Court to review these materials in light of the definition of "obscene" in TCA § 39–6–1101(5), (formerly TCA § 39–3001(5)), as amplified in TCA § 39–6–1101(6), (7), (8) and (9), (formerly TCA § 39–3001(6), (7), (8) and (9)), to determine whether they are "obscene matter", the distribution of which is prohibited by TCA § 39–6–1104(a), (formerly TCA § 39–3004(a)).

TCA § 39–6–1101 provides in pertinent part as follows:

(5) "Obscene" means:

(A) That the average person applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest;

(B) That the work depicts or describes, in a patently offensive way, sexual conduct; and

(C) That the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

(6) "Patently offensive" as used above means that which goes substantially beyond customary limits of candor in describing or representing such matters.

(7) "Person" as used in §§ 39–6–1101—39–6–1115 shall include the singular and the plural and shall mean and include any individual, firm, partnership, copartnership, association, corporation, or other organization or other legal entity, or any agent or servant thereof.

(8) "Prurient interest" means a shameful or morbid interest in sex.

(9) "Sexual conduct" as used above shall be construed to mean:

(A) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated. A sexual act is simulated when it depicts explicit sexual activity which gives the appearance of ultimate sexual acts, anal, oral or genital. The term "ultimate sexual acts" shall be construed to mean sexual intercourse, anal or otherwise, fellatio, cunnilingus or sodomy; or

(B) Patently offensive representation or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.

The three films were "Garden of Delight", "Red Garters" and "Billy and Sue Ann".

Only "Garden of Delight" has any semblance of a plot. In this movie a lifeguard is sweeping around the swimming pool. He is attracted by what appears to be a woman dressed in a bathing suit. He responds to her suggestive gestures and begins engaging in lovemaking. However, he soon discovers that the "woman" has a penis and is actually a transvestite. They engage in individual and mutual masturbation, fellatio, digital penetration of the anus and anal intercourse.

"Red Garters" and "Billy and Sue Ann" simply show a man and a woman engaged in vaginal intercourse, fellatio and cunnilingus from beginning to end without any story line.

The magazines were *Tortured TV's, Bizarre Fantasies* and *Connoisseur Series.*

*Tortured TV's,* (an abbreviation for transvestites, not televisions), consists of two men, both of whom are disguised as women engaged in fellatio, anal intercourse, individual and mutual masturbation and various masochistic acts utilizing a whip, a slapjack and sticks. From cover to cover the magazine consists of photographs of these activities and a description of the joys that these men named Tanya and Karen are receiving from their activities.

*Bizarre Fantasies* consists of three stories. In "Leather Revenge", two ladies engage in various sex acts with one man and with each other. Their activities consist of cunnilingus and mutual masturbation. However, their greatest emphasis is on their torture of the man. They whip him with leather whips, spike him with their boots, place a dog collar with a leash around his neck and place a clamp on his penis. In "The Fetish Connection" fetishes are discussed. A man is shown kissing a woman's buttocks, another is shown licking her nylon hose and another is shown with the spiked heel of a woman's shoe in his mouth. In "Eileen and Laura: Bitch Partners", two women are shown dressed in their leather wardrobe together with their leather whips and spiked heels. However, their clothing covers neither their breasts nor their genitals.

*Connoisseur Series* contains two stories, "The Milk Maid" and "Nurse Nymphs" and consists entirely of photographs of fellatio, cunnilingus, anal and vaginal intercourse and masturbation in progress. All of the photographs are in color and many consist of extreme close-ups of the parties' genitals.

▮ Our examination of these materials reveals that they depict and describe in a patently offensive way various acts of sexual conduct. These materials, taken as a whole, lack serious literary, artistic, political or scientific value. The average person, applying contemporary community standards, would find that each of these works, taken as a whole, appeals to the prurient interest, i.e., the shameful or morbid interest in sex. Hence, each of these works is "obscene". This issue has no merit.

In the final issue the appellants question whether a single sale by one person to an undercover police officer of six separate items can be the basis of multiple offenses and multiple sentences or must only a single fine or imprisonment be imposed. The appellants forcefully argue that it was only one offense for the purpose of punishment. The state argues with equal vigor that there was six separate offenses committed and that the single transaction is susceptible to six separate punishments.

The proof is unrebutted that there was one sale of two magazines and two motion picture films for $70.81 to undercover officers on March 18, 1981, by Ms. Davis. An additional magazine and film were given to the officers as a bonus.

*Blockburger v. United States,* 284 U.S. 299, 302, 52 S.Ct. 180, 181, 76 L.Ed. 306 (1932), dealt with the issue of whether the violation of two distinct statutory provisions during the course of a single criminal episode constituted two offenses or only one. In that case there were distinct and separate sales of drugs in violation of the Harrison Narcotic Act. 26 U.S.C., § 692. The Supreme Court held that each of the several successive sales constituted a distinct offense however closely they may follow each other. The Court quoted *Whar-*

*ton's Criminal Law* (11th Edition) § 34, for the proposition that "when the impulse is single, but one indictment lies, no matter how long the action may continue. If successive impulses are separately given, even though all unite in swelling a common stream of action, separate indictments lie". "The test is whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately. If the latter, there can be but one penalty."

In *Blockburger,* the Court noted that Section 1 of the Narcotics Act created the offense of selling any of the forbidden drugs except in or from the original stamped package. Section 2 of the Act created the offense of selling such drugs not in pursuance of a written order of the person to whom the drug is sold. Each of the offenses required proof of a different element. "(W)here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact that the other does not." 284 U.S. at 303–304, 52 S.Ct. at 182.

This latter "test" has come to be known as the "*Blockburger* test" to determine the identity of offenses. A line of Tennessee case law has followed that reasoning and applied the "same evidence" test as opposed to the "same transaction" test. *Duchac v. State,* 505 S.W.2d 237, 239 (Tenn.1973). In *State v. Black,* 524 S.W.2d 913, 920 (Tenn. 1975), our Supreme Court specifically applied the *Blockburger* test in finding distinct offenses of armed robbery and assault with intent to commit murder in the second degree.

In *Bell v. United States,* 349 U.S. 81, 83–84, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955), the appellant was convicted of violation of the Mann Act, 18 U.S.C. § 2421, which prohibits the interstate transportation of any woman or girl for the purpose of prostitution, debauchery, or any other immoral purpose. Mr. Bell had illegally transported two women in the same vehicle on the same trip and obviously at the same time. The

Court held that he could be convicted of only a single offense. In so doing the Court stated:

> When Congress has the will it has no difficulty in expressing it—when it has the will, that is, of defining what it desires to make the unit of prosecution and, more particularly, to make each stick in a faggot a single criminal unit. When Congress leaves to the judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity. . . .
>
> (I)f Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses, when we have no more to go on than the present case furnishes.

In *Sanabria v. United States,* 437 U.S. 54, 70, 98 S.Ct. 2170, 2182, 57 L.Ed.2d 43 (1978), the Supreme Court reiterated that "(w)hether a particular course of conduct involves one or more distinct 'offenses' under the statute depends on this congressional choice."

As applied to the sale of obscene materials, the appellate courts of Tennessee have not addressed the question of whether a single sale of several obscene items constitutes multiple offenses or only a single offense. However, guidance can be found by careful analysis of analogous cases.

In *State v. Campbell,* 549 S.W.2d 952, 955–956 (Tenn.1977), and *State v. Collier,* 567 S.W.2d 165, 167 (Tenn.1978), the defendants were convicted of multiple counts of selling illegal drugs. In *Campbell,* the defendant sold a Schedule II controlled substance and a Schedule IV controlled substance. The Supreme Court noted the evidence of legislative intent. The Court there stated:

> (W)e note that, although the sale of mixed controlled substances in the present case was committed in a single sales transaction, between the same principals at the same time and place, the sale may be sectored by acknowledging that two different schedule substances were sold, each of which has been, by statute,

separately classified and penalized by separate subsections of the general prohibitory statute. (citations omitted) Thus, under the *Blockburger* test, we hold that two distinct offenses were committed since the sale of each controlled substance "requires proof of an additional fact which the other does not," viz., the particular "schedule" identity of the controlled substance sold. 549 S.W.2d at 955.

In *Collier,* the Court determined that the possession of two or more controlled substances classified within the same schedule constituted separate and distinct offenses. The Court interpreted the language of the Drug Control Act prohibiting the manufacture, delivery, sale or possession with the intent to manufacture, deliver or sell "a controlled substance" to indicate a legislative intent to create a separate offense for the possession of each of the controlled substances listed in each of the six schedules. The Court noted that each drug within a given schedule was placed there because it was found to be dangerous, warranting control of that particular drug. Each substance is different and the illegality of each must be determined independently, without regard to the others. Proof was necessary that each drug was of a type prohibited by the statute. 567 S.W.2d at 167. See also: *United States v. Thompson,* 624 F.2d 740 (5th Cir.1980). (The defendant in *Thompson* was convicted of illegally selling six prescription drugs over a two day period. It was held that he could be sentenced on six separate counts, since the statute could reasonably be interpreted as making each unlawful dispensation a separate and distinct offense). *United States v. Noel,* 490 F.2d 89 (6th Cir.1974). (In *Noel,* the defendant sold two spoons of heroin to the same agent. He was convicted of two separate charges where each spoon was for a different individual).

In homicide cases where more than one death resulted from a single automobile accident, our Supreme Court has held that the killing of each human being constituted a separate offense, regardless of any fictional "intent" or whether there was a single "act" or a series of acts. *State v. Irvin,* 603 S.W.2d 121, 123 (Tenn.1980). The Court quoted *Vigil v. State,* 563 P.2d 1344, 1352 (Wyo.1977), as follows:

> As a general proposition, with few exceptions, in crimes against the person, when contrasted with crimes against property, there are as many offenses as individuals affected.

In *Gentry v. MacDougall,* 685 F.2d 322, 323 (9th Cir.1982), the Court held that by defining manslaughter as "the unlawful killing of a human being without malice", the Arizona legislature intended to authorize punishment for each human being killed, not simply for each unlawful act.

However, in other cases our Supreme Court has held that there can be only one conviction when the offenses all arose out of one transaction and involved but one criminal intent. In *Grant v. State,* 213 Tenn. 440, 374 S.W.2d 391, 393 (1964), an attorney was charged with four counts of contempt of court for advising four men to commit perjury. The Court held that this constituted only one violation, emphasizing the fact that the attorney had instructed the men as a group rather than individually.

In *Nelson v. State,* 208 Tenn. 179, 344 S.W.2d 540, 542 (1960), the Supreme Court examined the case of defendants who were convicted of fraudulent breach of trust after they illegally cashed eighty-five checks drawn on the account of their union over a two year period. The Court held that regardless of the amount of time that had elapsed between each taking, the successive takings constituted but a single larceny, since their actions were "pursuant to the execution of a general larcenous scheme".

In *State v. O'Guin,* 641 S.W.2d 894, 898 (Tenn.Cr.App.1982), this Court relied on *Nelson v. State,* supra, and held that the fraudulent sale of salvage automobiles resulting in Mr. O'Guin's conviction for six counts of larceny required modification of the judgment to reflect a single sentence. The defendant's acts were found to be "actuated by a single, continuing, criminal im-

pulse or intent, or (were) pursuant to execution of a general larcenous scheme."

In cases involving the sale of obscene material, other states have split over whether the sale of several obscene items in a single transaction constitutes one offense or several. In *People v. Tannahill,* 38 Ill. App.3d 767, 348 N.E.2d 847, 854 (1976), the operators of an adult bookstore were found guilty of nine separate offenses for selling nine sexually explicit magazines to undercover police officers on two separate visits to the store. The Court noted that each offense was subject to a separate fine under Ill.Rev.Stat.1973, Ch. 38, § 1005–9–1(a), the general fines statute which authorizes a fine for "each offense".

In *State v. Tara Enterprises, Inc.,* 202 Neb. 260, 274 N.W.2d 875, 880 (1979), the convictions for twenty-one counts of distributing, exhibiting or promoting obscene materials were affirmed. The maximum fine was assessed for each count and was not disturbed on appeal.

However, in *State v. Cimino,* 33 Conn. Sup. 681, 366 A.2d 1168, 1171 (1976), it was held that the sale of four obscene magazines wrapped together in a clear cellophane wrapper and sold as a package constituted only a single offense of promoting obscenity, and the Court noted:

> The classic test of multiplicity is whether the legislative intent is to punish individual acts separately or to punish only the course of action which they constitute. *Blockburger v. United States,* 284 U.S. 299, 302, 52 S.Ct. 180 [181], 76 L.Ed. 306. Here we are concerned with a single act of promoting obscenity by selling one package containing four magazines. If the contention were sound that more than one offense might be spelled out of that action of the defendant, why were separate counts not used for each lewd photograph or article included in each magazine? That reductio ad absurdum illustrates the soundness of the principle that the same act cannot constitute the same offense more than once, although it may give rise to more than one offense where it encompasses elements of differ-

ent crimes. *State v. Andrews,* 108 Conn. 209, 215, 142 A. 840. Unless a clear intention to fix separate penalties for each obscene item involved is expressed in the statute, the issue should be resolved against turning a single transaction into multiple offenses. *Bell v. United States,* 349 U.S. 81, 84, 75 S.Ct. 620 [622], 99 L.Ed. 905.

In *Adult Bookmart, Inc. v. State,* 152 Ga.App. 838, 264 S.E.2d 273, 274 (1979), and *Maxwell v. State,* 152 Ga.App. 776, 264 S.E.2d 254, 255 (1979), the Georgia Court of Appeals wrestled with this issue. In *Adult Bookmart, Inc.,* there was a single sale of two obscene magazines sold by one seller to one buyer in one transaction at the same time and place. The Court held that "the gravamen of the particular offense under consideration is selling obscene material, and there was only one sale. It follows that if there was only one sale, there was only one offense".

Likewise, in *Maxwell,* the Georgia court held that the showing of several obscene films or portions of obscene films as a single theater exhibition constitutes only one count of violating Georgia's Obscenity Statute. In that case the Georgia court cited *Bell v. United States,* supra, and adopted the same reasoning the Tennessee Supreme Court adopted in *Nelson v. State,* supra, and that this Court adopted in *State v. O'Guin,* supra. The Court there stated:

> The United States Supreme Court has held that unless otherwise provided by statute, a defendant convicted under an indictment charging two or more distinct offenses may be punished for both or all, if each offense requires proof of some fact or element not required to establish the other offense. However, for separate offenses charged in one indictment to carry separate punishments, they must rest on distinct criminal acts. If they were committed at the same time and place and parts of a continuous criminal act, and inspired by the same criminal intent, they are susceptible of only one punishment. 264 S.E.2d at 256.

On the other hand, the Georgia court has upheld separate convictions for obscene materials distributed through more than one sale. In *G & E Business Services, Inc. v. State,* 156 Ga.App. 391, 274 S.E.2d 644, 646 (1980), the Court affirmed thirty-nine separate convictions where the films seized came from separate coin operated peep show booths. The Court noted that in order to see any of the films one had to "enter an individual booth, deposit a number of coins, watch one film, and then either deposit more coins to see the second film in those booths with two films or move on to the next booth and repeat the entire process".

In *Playmate Cinema, Inc. v. State,* 154 Ga.App. 871, 269 S.E.2d 883, 886 (1980), the tickets to an obscene film were sold to two police officers and two obscene magazines were sold to another officer. The Court held that there were two offenses—one occurred in the theater and the other occurred in the bookstore.

In *State v. Hungerford,* 278 So.2d 33, 34 (La.1973), the Louisiana Supreme Court held that the simultaneous possession of five allegedly obscene periodicals in violation of La.Rev.Stat. 14:106 constituted a single offense. The Louisiana court noted the possibility that if the act of possession could be split into five offenses for each book or magazine, it could possibly be split into an offense for each page of each magazine or book.

In *State v. Getman,* 293 Minn. 11, 195 N.W.2d 827, 830 (1972), *vacated on other grounds,* 413 U.S. 912, 93 S.Ct. 3044, 37 L.Ed.2d 1029 (1973), and *State v. Carlson,* 291 Minn. 368, 192 N.W.2d 421, 429 (1971), it was held that defendants charged with multiple counts of violating the obscenity laws growing out of single transactions were subject to only one punishment. However, Minn.Stat.Ann. § 609.035 specifically provides that when a person's conduct constitutes more than one offense, he may be punished for only one of the offenses.

Our statute, TCA § 39–6–1104(a), (formerly TCA § 39–3004), provides as follows:
(a) It shall be unlawful to knowingly send or cause to be sent, or bring or cause to be brought, into this state for sale, distribution, exhibition, or display, or in this state to prepare for distribution, publish, print, exhibit, distribute, or offer to distribute, or to possess with intent to distribute or to exhibit or offer to distribute any obscene matter. It shall be unlawful to direct, present, or produce any obscene theatrical production, peep shows or live performance and every person who participates in that part of such production which renders said production or performance obscene is guilty of said offense.

The legislative intent is not apparent from the face of this statute. Whether the gravaman of the offense is the act of distribution of obscene material or whether the focus is on the distribution of each individual item is not apparent. However, in another section of our obscenity statutes, it is provided that (except for adult bookstores where persons under eighteen years of age are not admitted), stores selling literature or other material of a predominantly sexual nature must display the material at a height of not less than five and one-half feet above the floor. TCA § 39–6–1136(a). This section specifically provides that "each such magazine, book or newspaper displayed in violation of this section shall constitute a separate offense". TCA § 39–6–1136(b). The learned text-writer, in his noted work on statutory interpretations, stated: "where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed". 2A Sutherland, *Statutory Construction* § 51.03, p. 291 (4th Ed.1973 and Supp.1982), quoting *Western States Newspapers, Inc. v. Gehringer,* 203 Cal.App.2d 793, 22 Cal.Rptr. 144 (1962).

Thus, the inclusion of the one item-one offense rule in TCA § 39–6–1136 and the omission of that rule from TCA § 39–6–1104 could indicate that the legislature did not intend for each item in a single sale of obscene matter to amount to a separate

offense. When the legislature's intent cannot be clearly ascertained, it is improper for the courts to guess what was intended. *Bell v. United States,* supra.

 In this case the legislature not having fixed the punishment for the sale of each obscene item as part of a single transaction clearly and without ambiguity, the doubt must be resolved in favor of a single offense as opposed to multiple offenses.

Therefore, the judgment is modified to reflect that each defendant is guilty of one offense of selling six obscene materials.

The fine is reduced from $300,000.00 to $50,000.00, and the jail sentence is reduced to one term of sixty days confinement. As modified the judgment is affirmed.

TATUM and BYERS, JJ., concur.